## BLANKENSHIP et al. v. KURFMAN et al.
## No. 6501.

Circuit Court of Appeals, Seventh Circuit.
April 26, 1938.

---

John A. Brown, of Chicago, Ill., and Vincent Morreale and Edward O'Connor, both of New York City, for appellants.

452

Edmund Burke and Louis Gillespie, both of Springfield, Ill., and George Z. Barnes, of Peoria, Ill., for appellees.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

TREANOR, Circuit Judge.

This appeal is prosecuted from an order of preliminary injunction issued by the District Court of the United States for the Southern District of Illinois, Northern Division. The plaintiffs, as individuals and as members of local union No. 702 of the International Brotherhood of Electrical Workers, filed their bill of complaint for an injunction in the District Court, seeking to restrain the defendants, individually and as members of local union No. 165 of the International Hod Carriers Building and Common Laborers Union, from interfering with, threatening, intimidating, or exerting violence against the plaintiffs while in the course of their employment with the Central Illinois Light Company.

The plaintiff and defendant unions are affiliated with the American Federation of Labor and, as between these two groups, the - controversy primarily involved the question of jurisdiction as members of the American Federation of Labor. The members of the International Brotherhood of Electrical Workers are all employees of the Central Illinois Light Company, and the particular members of the local union No. 702 who are involved in this suit are the employees of the gas department of the Central Illinois Light Company. The work which was being done by the plaintiffs and which was involved in this suit consisted of digging and filling in difches, taking up and laying down mains and service lines, of running pipes to street curbs, and cutting weeds on the company's property, and was of the general type described by the term "common labor."

In November, 1936, the employees of the gas department of the Central Illinois Light Company joined local union No. 702 of the International Brotherhood of Electrical Workers. Prior to that time they had not been members of any labor organization. Representatives of the International Hod Carriers Building and Common Laborers Union attempted to negotiate a contract with the Central Illinois Light Company for the purpose of securing the work in question for members of their organization, but the light company refused to negotiate with them on the ground that they were already negotiating a contract with the representatives of their own employees who had been selected by a majority of the employees. Subsequently, a contract was entered into between the Central Illinois Light Company and Local Union No. 702 of the International Brotherhood of Electrical Workers. After the contract was entered into and the plaintiff members of the International Brotherhood of Electrical Workers attempted to perform their work, groups of men headed by the defendants ·congregated about the places where the plaintiffs were working and demanded that they stop working, and threatened them with physical violence if they refused to obey. Plaintiffs were told that they "would have to join the International Hod Carriers Building and Common Laborers Union or would have to get off the job until they got things straightened out." There were some acts of personal violence and as a result of the violence and threats the plaintiffs were so intimidated and coerced that they abandoned their work.

The plaintiffs are by. their own choice members of the local union of International Brotherhood of Electrical Workers and as such members had designated the officers and representatives thereof to bargain collectively for them with their employer, the Central Illinois Light Company. There was no controversy of any kind between the plaintiffs and their employer; and in negotiating and consummating the contract the plaintiffs and their employer proceeded generally in accordance with the terms of the National Labor Relations Act, 29 U. S.C.A. §§ 151–166.

There is no diversity of citizenship, and the grounds of federal jurisdiction relied upon by the plaintiffs, and recognized by the trial court, were that the alleged unlawful acts of the defendant (1) deprived the plaintiffs of the free exercise and enjoyment of rights and privileges secured to them by the National Labor Relations Act, and (2) affected the free flow of commerce among the several states.

In addition to other facts the trial court found the following:

"10. * * * and, by reason of the interference with the performance of said contract aforesaid, between said plaintiffs and their employer, and the interference with interstate commerce in the manner aforesaid, and the conspiracy on the part of said defendants to continue their unlawful acts with respect thereto, substantial and·

irreparable injury to plaintiffs' property will follow, and the free flow of commerce between the several states will be obstructed.

"11. That this case does not involve a controversy between an employer and its employees.

"12. That a preliminary injunction should be immediately granted to remain in force until the further order of this Court."

The court also stated conclusions of law Nos. 1 and 2 as follows:

"(1) That the Plaintiffs have no adequate remedy at law.

"(2) That the Norris-LaGuardia Act [29 U.S.C.A. §§ 101–115] has no application to this case."

The foregoing second conclusion of law obviously rested upon finding of fact No. 11, which is "that this case does not involve a controversy between an employer and its employees." Prior to the decision of this case by the District Court, the Circuit Court of Appeals of the 7th Circuit had held that the term "labor dispute," as used in the Norris-LaGuardia Act, necessarily implied the relationship of employee and employer between the disputants.[1]

■ But the recent decisions of the Supreme Court of the United States in Senn v. Tile Layers Protective Union,[2] Edward Lauf v. Shinner & Co.[3] and New Negro Alliance v. Sanitary Grocery Co., Inc.,[4] clearly have established that there can be a labor dispute, within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, in the absence of relation of employer and employee, and even when "the petitioners are not engaged in any business competitive with that of the respondent, and the officers, members, or representatives of the Alliance [petitioners] are not engaged in the same business or occupation as the respondent or its employees."[5]

In view of the foregoing decisions, the facts as found by the District Court in the instant suit clearly disclose a "case involving or growing out of a labor dispute," as defined in the Norris-LaGuardia Act, § 1, 29 U.S.C.A. § 101. Consequently, the District Court was without jurisdiction to issue the temporary injunction without complying with the provisions of that act. And since the court did not comply with the provisions of that act, its decree and judgment must be set aside.

■ The proposition of the plaintiffs that the effect of the National Labor Relations Act, especially sections 157 and 159 (a) of title 29 U.S.C.A.,[6] is to create a federal right, the violation of which by the defendants entitles plaintiffs to injunctive relief, is untenable.

In Lund v. Woodenware Workers Union[7] an employer was seeking, in a federal court, to enjoin a striking minority of employees from interfering by violence or intimidation with a contract, which had been made by the employer with representatives selected by the alleged majority of the employees. In that case, as in the instant case, there had not been any action by the National Labor Relations Board in connection with the negotiation of the contract. It was urged upon the court that by reason of section 159 (a) of the National Labor Relations Act[8] the employer had the right to proceed in a federal District Court to restrain the minority of his employees from in any way interfering by violence or intimidation with the contract made between the employer and the designated representatives of the majority. But the District

---

[1] United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1; Lauf v. Shinner & Co., 7 Cir., 82 F.2d 68.

[2] 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229.

[3] Feb. 28, 1938, 58 S.Ct. 578, 82 L.Ed. —.

[4] March 28, 1938, 58 S.Ct. 703, 704, 82 L.Ed. —.

[5] New Negro Alliance v. Sanitary Grocery Co., supra.

[6] "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." 29 U.S.C.A. § 159 (a).

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 157.

[7] D.C., 19 F.Supp. 607.

[8] Title 29 U.S.C.A., supra.

Court concluded that the plaintiff was seeking to enforce a right which was not created, either expressly or impliedly, by the federal statute in question; and that he was seeking to read into the act certain rights for employers and employees which Congress studiously refrained from giving to either. We agree with that conclusion.

The general purpose of the National Labor Relations Act is to provide methods of preventing or eliminating certain "unfair practices" which have heretofore characterized the relation of employer and employee, and which have obstructed, or tended to obstruct, the free flow of commerce. The act creates certain rights and duties as between employer and employee and provides the procedure necessary to give effect thereto. It seems clear that the only rights which are made enforceable by the act are those which have been determined by the National Labor Relations Board to exist under the facts of each case; and when these rights have been determined, the method of enforcing them which is provided by the Act itself must be followed. And we find no provision in the act which can be construed as intending to create rights for employees which can be enforced in federal courts independently of action by the National Labor Relations Board. Consequently, we hold that the contract in the instant case between the plaintiffs and their employer did not, by force of the National Labor Relations Act, create a right in the plaintiffs which was secured to them "by the Constitution or laws of the United States." Consequently, the alleged unlawful interference by the defendants with the plaintiffs' contractual rights did not give a cause of action of which a federal court would have jurisdiction in the absence of diversity of citizenship.

 Also, we are of the opinion that the facts do not make a case for the issuance of an injunction to restrain interference with interstate commerce.

The business of the Central Illinois Light Company was strictly local and intrastate. Its supply of gas was received through pipe lines from points outside the state, but all of the gas which was thus received was retailed by the company for local consumption. The evidence discloses that among the customers of the company were three local industries and that these industries were engaged in manufacturing products which were sold in interstate commerce. There was also evidence that continuous supply of gas to these industries was necessary for their operation.

It is settled by decisions of the Supreme Court of the United States that intrastate acts will be enjoined whenever necessary or appropriate for the protection of interstate commerce against any restraint denounced by the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. And it was held in Coronado Coal Co. v. United Mine Workers[9] that there was a violation of the Anti-Trust Act where the evidence was sufficient to show that the intrastate activities of the members of a union constituted a combination for the purpose of stopping the production of nonunion coal and preventing shipping to markets of other states. But as stated in the recent case of Santa Cruz Fruit Packing Co. v. National Labor Relations Board,[10] "It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection."

The conspiracy or combination which is denounced in the Sherman Anti-Trust Act must be one which is dominated by an intent to interfere with interstate commerce; although such intent exists as a matter of law if the necessary result of contemplated acts is to restrain commerce. Furthermore, there is no immunity in the fact that the ultimate objective is to attain a legitimate advantage if the means include activities which in fact restrain commerce. In the instant case the evidence does not justify an inference that the defendants were influenced by an actual intent to interfere with interstate commerce. The obvious and sole purpose of their activities was to secure for their group the work which was being performed by the plaintiffs. There was no evidence that the activities of the defendants had cut off the supply of gas to the Central Illinois Light Company or had interfered with the supplying of gas by that company to the manufacturing industries of the locality. Nor did the evidence justify the inference that the activities of the defendant, even if persisted in, would result in interruption of such service in the future.

---

[9] 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963.

[10] March 28, 1938, 58 S.Ct. 656, 660, 82 L.Ed ——.

The manager of the gas department of the light company testified as follows: "You ask what effect, if any, would the supply of gas to the Keystone Company, the Caterpillar Company and Altorfer Brothers and the various other concerns that I have testified the company serves, if the ditch digging employees should not work for say 30 days. I answer that nothing would happen, I would assume, unless we had work to do on their property, unless there was some work in the main or something along the line. We would continue to serve them with gas and would be able to if no interruption at the source of supply should happen."

Also the same witness testified to the following conversation between one of the defendants and himself: "Mr. Voyzey asked me if we received our gas by pipe line. I told him we did. He asked me if it was a single pipe line. I told him it was. He said: 'Pipe lines break sometimes, do they not?' I told him they did, it had been known to happen. He merely stated: 'It might break again.'"

But all the evidence respecting the activities of the defendants limited these activities to efforts to induce the plaintiffs to become members of the defendant union or, by threats and some acts of violence, to compel them to desist from the work in which they were engaged at the time. There is no evidence that the work which the plaintiffs were then doing was necessary to insure the continuation of the supply of gas from the pipe line to the Central Illinois Light Company or to the industries to which the company supplied gas.

The acts of the defendants undoubtedly were unlawful, but we are of the opinion that the evidence is not sufficient to establish that these acts were such as to show an unlawful combination or conspiracy "in restraint of trade or commerce," under the Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

The two Coronado Cases[11] are instructive for the light they throw on the necessary elements of a combination or conspiracy in restraint of commerce under the Sherman Anti-Trust Act, when the activities are intrastate and are aimed directly to the prevention of manufacture or production. It is clear from the opinions in those two cases that an essential element is "an intent to restrain or control the supply entering and moving in interstate commerce." The foregoing was pointed out in National Labor Board v. Jones & Laughlin Steel Corporation,[12] and the following excerpts from the opinion is, for our present purpose, more instructive than the opinions in the two Coronado decisions:

"Upon the same principle, the Anti-Trust Act [15 U.S.C.A. § 1 et seq.] has been applied to the conduct of employees engaged in production. [Citing cases.] The decisions dealing with the question of that application illustrate both the principle and its limitation. Thus, in the first Coronado Case, the Court held that mining was not interstate commerce, that the power of Congress did not extend to its regulation as such, and that it had not been shown that the activities there involved—a local strike —brought them within the provisions of the Anti-Trust Act, notwithstanding the broad terms of that statute. A similar conclusion was reached in United Leather Workers' Union v. Herkert & Meisel Trunk Co., supra [265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566], Industrial Association v. United States, supra [268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849], and Levering & Garrigues v. Morrin, 289 U.S. 103, 107, 53 S.Ct. 549, 550, 77 L.Ed. 1062. But in the first Coronado Case, the Court also said that 'if Congress deems certain recurring practices though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint.' 259 U.S. 344, at page 408, 42 S.Ct. 570, 582, 66 L.Ed. 975, 27 A.L.R. 762. And in the second Coronado Case the Court ruled that, while the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce nevertheless when the 'intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act.' 268 U.S. 295, at page 310, 45 S.Ct. 551, 556, 69 L.Ed. 963. And the existence of that intent may be a necessary inference

11 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762 and 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963.

12 301 U.S. 1, at page 39, 57 S.Ct. 615, 625, 81 L.Ed. 893, 108 A.L.R. 1352.

from proof of the direct and substantial effect produced by the employees' conduct. Industrial Association v. United States, 268 U.S. 64, at page 81, 45 S.Ct. 403, 407, 69 L.Ed. 849. What was absent from the evidence in the first Coronado Case appeared in the second and the act was accordingly applied to the mining employees."

The recent decisions in cases under the National Labor Relations Act, 29 U.S.C.A. §§ 151–166, are instructive for the purpose of determining whether certain activities affect commerce. But these cases do not involve the problem of determining the existence of a conspiracy or combination in restraint of commerce.

Our attention is directed to the decision of the United States Circuit Court of Appeals, Second Circuit, in the case of Consolidated Edison Company of New York v. National Labor Relations Board, 95 F.2d 390, 394, decided March 14, 1938, in which case the relationship of the parties, whose conduct affected the question of restraint of commerce, was similar to that of the parties in the instant case. In the Consolidated Edison Company Case the petitioners were a parent public utility holding company and six subsidiaries engaged in the production and distribution of electricity, steam, and gas within the limits of New York City and adjacent territory, their business being entirely intrastate. The petitioners imported great quantities of coal and oil from outside the state and furnished electric energy to five railroads to light and operate their freight and passenger terminals and for the movement of interstate trains; and also supplied steam to another railroad to operate the switches in its tunnel under the Hudson river. The court's opinion summed up the necessary result of an interruption of petitioners' service in the following statement:

"Should such a dispute result in interrupting the petitioners' service, the effects upon commerce would be catastrophic. We mention only some of them. Instantly, the terminals and trains of three great interstate railroads would cease to operate; interstate communication by telegraph, telephone, and radio would stop; lights maintained as aids to navigation would go out; and the business of interstate ferries and of foreign steamships, whose docks are lighted and operated by electric energy, would be greatly impeded. Such effects we cannot regard as indirect and remote."

The court concluded that petitioners' business, though local and intrastate in respect to production and distribution, was so intimately and substantially related to interstate commerce that an interruption of its production and distribution service would affect commerce. We see no reason to disagree with that conclusion.

The foregoing case, however, was a case arising under the National Labor Relations Act, and if the "unfair practice" tended to provoke labor disturbances which would result in interruption of production and distribution by the petitioners, the court was free to posit such interruption for the purpose of considering its effect upon commerce. And, granting the interruption, the inevitable result would be a direct, necessary, and substantial restraint upon interstate commerce. An intent to restrain was not involved. But in the instant case the acts of the defendants had not resulted in any interference with interstate commerce and the evidence did not show a probability that such an interference would result from their continuance. There was no direct evidence of an intent to interfere with interstate commerce, and there was no proof of a direct and substantial effect upon commerce from which to draw a necessary inference of an intent to restrain or control the supply entering and moving in interstate commerce, such as was true in the Coronado Cases.

The decree of temporary injunction is reversed and the District Court is directed to vacate the order of temporary injunction and to dismiss the bill of complaint.