**LAKE. VALLEY FARM PRODUCTS, Inc., et al. v. MILK WAGON DRIVERS' UNION, LOCAL 753, et al.**

**No. 6900.**

Circuit Court of Appeals, Seventh Circuit.
Nov. 29, 1939.

Rehearing Denied Jan. 9, 1940.

438

TREANOR, Circuit Judge, dissenting.

————◆————

Arthur R. Seelig, of Chicago, Ill., for appellants.

David A. Riskind and Abraham W. Brussell, both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

This action in equity was instituted by appellants, and Josef Wagner, doing business as Wagner Dairy Products. It sought to restrain appellees from picketing, and from the commission of acts of violence and boycott alleged by appellants to be in restraint of interstate trade and in violation of the Sherman Anti-Trust Act, 15 U.S. C.A. §§ 1–7, 15 note, and the Clayton Act, 38 Stat. 730. Appellees filed a joint answer which in effect was a general denial and contained other affirmative matters. The issue of injunction was referred to a Master in Chancery, and his report recommended the dismissal of the complaint for lack of jurisdiction. A hearing was had upon appellants' exceptions to this report, and after making special findings of facts, and rendering its conclusions of law thereon, the District Court entered a decree confirming the report, and ordering dismissal for want of jurisdiction and for want of equity.

The findings are substantially as follows: The plaintiffs are the Lake Valley Farm Products, Inc., an Illinois corporation of Chicago, engaged in processing and distributing milk and dairy products in Chicago; Lake View Co-operative of Watertown, Wisconsin, an organization of Wisconsin farmers; Josef Wagner, doing business as Wagner Dairy Products in Cook County, Illinois; and Amalgamated Dairy Drivers, Local Industrial Union No. 819, a voluntary unincorporated association with its headquarters in Chicago. Before the findings were filed, Wagner, by leave of court, withdrew as party plaintiff.

The defendants are the Milk Wagon Drivers Union of Chicago, Local 753, a voluntary unincorporated association with headquarters in Chicago; Robert G. Fitchie, James Kennedy, Steve Sumner, F. Ray Bryant, Alvin F. Richards, Joseph L. Patterson and Fred C. Dahms, who are officers and trustees of the defendant union.

The Farm Products Company purchases its daily requirements of fluid milk from the plaintiff Co-operative, which receives its product from farmers in Wisconsin, who deliver their milk to the plant of the Co-operative where it is loaded on motor trucks and transported over the public highways to the Farm Products Company in Chicago, which pasteurizes and bottles the milk, after which it is sold by the Farm Products Company to various persons referred to as "vendors," who severally own and operate their own automobile truck equipment. They in turn, after purchasing the milk and cream from the pasteurizing plant, distribute it to various stores which in turn sell it to the general public on a cash and carry plan. These "vendors" are not members of the defendant union.

The plaintiff union was organized on March 1, 1938, and maintains executive offices in Chicago. Its members are residents and citizens of Illinois.

The defendant union was organized in 1902 and since that time has unionized the majority of drivers delivering milk and other dairy products, and its headquarters are in Chicago. All the individual defendants are residents and citizens of Illinois.

Over forty per cent of the milk and over seventy-five per cent of the cream sold in Chicago comes from points outside of Illinois. It is commingled, sold in competition with, and is indistinguishable from the

milk and cream which is produced in Illinois. The pasteurization and bottling require a very short time. Nothing is added to or taken from the milk and cream by such process and only a few hours elapse from the time it leaves the point of origin in Wisconsin until it is lodged in the retail stores.

The Farm Products Company is a cut-rate dairy in that it distributes its milk through retail stores by cash and carry sale, and at prices substantially less than the generally prevailing price for milk delivered by the dairy to the home. Because of the relatively large amount of milk delivered to each retail store, the cost of such delivery is substantially less than the cost of delivering milk on a retail route to the doorstep of the ultimate consumer.

The growth of the cut-rate milk business in Chicago has been accompanied by violence to the distributing stores. They have had their windows broken, they have been bombed, set afire, they have been submitted to stench bombs and to other acts of violence. Cut-rate dairy plants have been bombed, have had machinery smashed, and their delivery trucks have been seized and destroyed, and they have been submitted to other acts of violence.

Picketing by the defendant union has all taken place at and in front of stores selling the products of the plaintiff dairy, and no picketing has taken place at the plaintiff dairy plant. In some instances deliveries of other necessary food products into stores selling plaintiffs' dairy products have ceased.

Fifteen to twenty stores distributing the products of plaintiff dairy were lost in the month preceding the filing of the bill of complaint; twenty-five to thirty stores were similarly lost since the commencement of the action; more than one hundred of such stores have been picketed, and there is no way to ascertain the number of consumer patrons lost by the acts of the defendant. No labor dispute exists between plaintiff dairy and its workers.

The court in its last finding says that it adopts by reference the various findings of fact made by the Master in his report. This report is rather voluminous and contains much that cannot be considered as findings of fact. We find nothing additional in this report which is material to the issues passed upon by the District Court, except perhaps that all of the employees of the plaintiff dairy are members of the plaintiff union and have designated that union as their sole representative in dealing with the dairy. The Master further found that the plaintiffs had not established the fact that they had no adequate remedy at law and had not alleged or proved that the public officers charged with the duty to protect their property were unable or unwilling to furnish adequate protection.

He further used the following language in his findings:

"It also appears from the evidence before the Master that certain of the cut-rate milk stores that handled the products of the Plaintiff Dairies were picketed by members of the Defendant Union; that such picketing was usually indulged in for a number of days during which time said pickets sought to induce the offending storekeepers to discontinue the purchase of such milk from the Plaintiff Dairies; that in several instances where their efforts were unsuccessful said pickets were withdrawn and within a few days thereafter, usually during the night the store of the storekeeper (some of whom were poor women struggling to make a living) was either bombed or bricks were thrown through the plate glass windows of such stores or other acts of violence were committed. To request the Master to conclude and find, in the absence of proof of the identity of the guilty culprits, that there was no connection between such acts of violence and the Defendant Union, or some of its members, is to overtax the credulity of the Master.

"The Master cannot condone or too severely condemn the resort to such malicious and cowardly conduct in support of any cause. Such lawless conduct has no place under our form of Government and the few lawless, radical union leaders or members who resort thereto are not only a blight upon the righteous cause of honest labor but reflect discredit upon our country and upon our American civilization as well."

The District Court concluded that it had no jurisdiction on the ground of diversity of citizenship; that the actions of the defendants did not constitute a violation of the Sherman Anti-Trust Law and the Clayton Act; that the defendants' actions did not constitute an unlawful conspiracy, and did not effect an unlawful monopoly as defined by the two Acts last referred to; that the activities of the defendants did not constitute an unlawful secondary boycott or deprive plaintiffs of rights guaranteed to them under the Constitution and laws of the United States or of the State of Illinois;

that under the circumstances presented a labor dispute existed as defined by the terms of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.; that the court was without jurisdiction to grant the injunctive relief or any part of the relief prayed for by the plaintiffs; that the plaintiffs were not entitled to any of the relief prayed for in the bill and that the equities of the case were with the defendants.

The decree immediately followed dismissing the cause of action as to Wagner, with prejudice, and overruling the other plaintiffs' exceptions and their application for preliminary and permanent injunction. The decree further dismissed appellants' bill of complaint both for want of jurisdiction, and for want of equity. The language of the conclusions of law and the decree indicates without doubt that the court passed upon all the questions presented, but we have great doubt whether all should have been passed upon. For instance, after the court found that it was without jurisdiction, it is not clear why it proceeded to pass upon the merits. Of course there was no jurisdiction on account of diversity of citizenship, but if there was a violation of the Sherman Anti-Trust Law and the Clayton Act with respect to interstate commerce, there would still be jurisdiction of the cause, and that would carry with it the right to decide rightly or wrongly all questions therein involved. Whether or not there was a labor dispute within the purview of the Norris-LaGuardia Act, or whether there was a conspiracy or a secondary boycott, would seem to us not to be determinative of the question of jurisdiction providing interstate commerce was involved within the purview of all the acts referred to. The bill of complaint was treated as sufficient by all parties except that appellees claimed that both the bill and the evidence showed that interstate commerce was not affected. This contention of course was denied by appellants, and it was the duty of the court to pass upon this question in order to determine whether it had jurisdiction of the subject matter. This it did, holding that it had no jurisdiction. We assume, therefore, that this ruling was based on the ground that interstate commerce was not affected. If this were true, the court was without jurisdiction to pass upon the merits of the other questions presented. If, however, interstate commerce was involved, as alleged, the mere fact that the Sherman or the Clayton Act was not violated, or the

Norris-LaGuardia Act not followed, would not defeat the court's jurisdiction to determine those matters, for jurisdiction presupposes the right to decide a question either rightly or wrongly.

Under the facts found, it is clear that there is an actual flow of milk in interstate commerce from the farm-receiving station in Wisconsin, through the plaintiff dairy into the retail cut-rate stores in Chicago. It is equally clear from the facts found that appellees' activities did seriously burden and affect the distribution of this milk by the stores to their cash and carry customers. In the light of these facts it is maintained by appellants that the court erred in its conclusions of law that the actions of the defendants did not burden or affect interstate commerce, and for that reason did not violate the anti-trust laws. The Master and counsel for appellees seem to have proceeded on the theory that the milk came to rest in the cut-rate stores and thereby ceased to flow in interstate commerce and for that reason the acts complained of did not constitute an interference with interstate commerce within the purview of the anti-trust laws. The findings and conclusions of the court do not specifically mention this reason as a basis for its conclusion, but inasmuch as it adopts the findings of the Master by reference, we assume that the bases of its conclusions are the same as those of the Master. Both seem to have relied upon the "stream of commerce" doctrine which is quite familiar in the application of federal and state taxes. It would seem, however, that this test is not to be used in anti-trust cases, for there the point at which the stream or current of interstate commerce ceases is seldom if ever involved, but the real controversy is the effect of the acts complained of upon interstate commerce. In Local 167, I. B. T. v. United States, 291 U.S. 293, 54 S.Ct. 396, 398, 78 L.Ed. 804, there was a combination of wholesalers of poultry in New York City to increase the price of and monopolize the wholesale trade in poultry purchased by them from commission men to whom such poultry was shipped from other states. The combination was held to be in restraint of interstate commerce in violation of the Sherman Act, although the purpose was made effective by acts committed within the state after the interstate transportation of the poultry had terminated. The Court said: "The evidence shows that they and other defendants conspired to burden the

free movement of live poultry into the metropolitan area. It may be assumed that some time after delivery of carload lots by interstate carriers to the receivers the movement of the poultry ceases to be interstate commerce. [Citing cases.] But we need not decide when interstate commerce ends and that which is intrastate begins. The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce. [Citing cases.] The Sherman Act denounces every conspiracy in restraint of trade including those that are to be carried on by acts constituting intrastate transactions. [Citing cases.]" Again the Court said: "And, maintaining that interstate commerce ended with the sales by receivers to marketmen, appellants insist that the injunction should only prevent acts that restrain commerce up to that point. But intrastate acts will be enjoined whenever necessary or appropriate for the protection of interstate commerce against any restraint denounced by the Act." The same principle of law was followed in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Santa Cruz Fruit Packing Company v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; and United States of America v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. All these cases followed the doctrine as set forth in W. W. Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608.

In view of these decisions, and under the findings of the court and the Master, we think it is clear that interstate commerce was involved and was quite seriously affected and burdened by the picketing activities of the defendants in and about the stores that sold the milk in controversy. We find no conflicting testimony as to this fact. We are further of the opinion that the uncontradicted evidence and findings disclose that the Sherman Anti-Trust Law and the Clayton Act were clearly violated.

It is contended by appellees, however, that there is no evidence of conspiracy. To prove a conspiracy, it is not necessary to establish it by direct testimony that a precise agreement was entered into by the parties accused. In most cases of that character this would be impossible to do, and for this reason a conspiracy may be safely based upon circumstantial evidence if the circumstances are sufficiently convincing. Everyone is presumed to intend the natural consequences of his acts. Here the picketing activities of the defendants and the results thereof were admitted. The picketing occurred only at the stores, and its admitted object was to induce the storekeepers not to sell the milk. This object was successfully attained and the result was due to the united and confederated actions of these defendants. The immediate result of their accomplishments in this respect was to retard the flow of the milk in interstate commerce from Wisconsin to Illinois. This was the natural consequence of their picketing activities and they were bound to know it. Indeed, there was no claim by the defendants that they were not fully cognizant of all these facts, and for these reasons we think their acts did constitute an unlawful conspiracy within the purview of the Sherman and the Clayton Acts.

The record discloses, and it is not denied, that the defendant union controls the distribution of practically all the milk that is sold in Chicago. Its only competitors of any consequence are these cut-rate distributors, and if they were eliminated from the field it is not denied that defendants' union for all practical purposes would have a complete monopoly over the distribution of milk in this city. It is clear that this was the object of the defendants and this object was the sole cause of this controversy.

It is contended by appellants that no labor dispute was present in this controversy, and that the acts of the defendants, which are here sought to be restrained, constitute an unlawful secondary boycott designed to destroy the business of the plaintiff dairy. Whether there was a labor dispute is to be determined by the Norris-La-Guardia Act, 29 U.S.C.A. §§ 101–115. Subsections (a), (b) and (c) of section 113 are immediately involved here.[1] From the

---

[1] "(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one

terms of this Act, it would seem clear that before a labor dispute can be said to exist, there must be an honest issue involved and there must be persons capable of being organized. It is appellants' contention that neither of these elements exists in the present case. It is not denied that the "vendors" referred to in the findings are independent contractors and are not in the employ of the dairy. They buy and sell for their own profit and are not salaried workers. It is conceded also that the owners or managers or employees of the stores which sell the milk to the ultimate consumers are not employees of the dairy or of the "vendors" and none of them are eligible to membership in the defendant union. The defendant union is a craft union for milk wagon drivers who are employees of dairies. A study of this record, including the articles of agreement used between the defendant union and its subscribing dairies, leaves no room for doubt that these "vendors" in their present occupation, or any like occupation, would not be acceptable as members in the defendant union. It is true that some, and perhaps all of them, have been solicited for membership in the defendant union, but such solicitation was upon the condition that they would cease handling cut-rate milk as "vendors" or as employees of the plaintiff dairy, while it was thus engaged. Under these conditions we think it cannot be fairly said that there is a good faith labor issue involved between the defendant union and either the dairies' employees or the "vendors" or the stores. Especially is this true when we consider the fact that the "vendors" are organized as members of a well-recognized union, which with their consent is acting as their representative in matters dealing with their employers.

A study of this entire record is quite convincing of the fact that this entire controversy is over the question of the sale of cut-rate milk and the "vendor" system. There is no finding that these "vendors" are not receiving sufficient remuneration for their labor, or that their conditions of labor are not what they should be. The evidence is quite convincing to the contrary. In any event, it would seem that the defendant union is in no position to raise those questions as to the "vendors," who are independent contractors, and who in their present condition are not eligible for membership in the defendant union. It seems clear to us that there is no labor controversy involved here.

Moreover, we think it is clear from the findings and from the undisputed evidence in this case that the appellees' picketing activities constitute a secondary boycott, which is an unlawful activity, of which appellees could not avail themselves even though a labor dispute were involved. See Duplex Printing Press Company v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Meadowmoor Dairies, Inc. v. Milk Wagon Drivers' Union of Chicago No. 753, 371 Ill. 377, 21 N.E.2d 308. The latter case deals with the same questions here presented, except as to the federal questions, only one of which is presented, and it also involves the same defendant union. It construes the Illinois Injunction Act, Ill.Rev.Stat.1937, c. 48, § 2a, which in many respects is quite similar to the analogous federal Acts. The opinion is very well considered, and we are in accord with the conclusions there reached in so far as they are here applicable.

---

or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

It is contended by appellees, however, that the prevention of peaceful picketing of the cut-rate stores would be a violation of the constitutional right of free speech [U.S.C.A.Const. Amend. 1], although such acts might be considered as a secondary boycott. We do not understand this to be the law. The same question was presented in the Meadowmoor case, supra, and it was decided adversely to appellees' contention. In that case certiorari was sought in the United States Supreme Court on that particular question, and certiorari was denied. This ruling of the Illinois Supreme Court is supported by Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154.

The Master found that appellants had not established the fact that they had no adequate remedy at law, and that there was no proof that the public officers charged with the duty to protect appellants' property were unable or unwilling to furnish that protection. Aside from the procedural requirements of the Norris-LaGuardia Act, we think it is clear from the undisputed evidence that appellants had no adequate remedy at law. Inasmuch as we hold that there was no labor dispute involved, appellants were not authorized or required to proceed under that Act. With respect to the ability of the police officers to cope with the situation, we think it is clear from the number of stores involved, and the magnitude and seriousness of the activities which had continued for several years, that the police officers were unable to control the situation.

Without any intention to criticize the form of the court's findings, it is difficult to ascertain the precise reasons for the rulings. From the Master's report, which the court adopts by reference as a part of the findings, it is quite likely that all of these rulings were based upon the finding that interstate commerce was neither involved, burdened, nor affected. If we should accept this finding as true we could readily approve the result, for the court would have been without jurisdiction and the appellants would not be entitled to the relief they asked. Again, if jurisdiction were conceded and there was a labor dispute involved, then it is quite doubtful if appellants could recover because they have not in every respect complied with the requirements of the Norris-LaGuardia Act. Holding as we do that the court had juris-

diction, we must reverse the order of the court which holds there was no jurisdiction, and in view of our holding that there was no labor dispute involved, and that the acts complained of amounted to an illegal secondary boycott, we must likewise reverse for those reasons.

In view of these conclusions we think the other conclusions of law, except as to the diversity of citizenship, are erroneous. The decree is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

TREANOR, Circuit Judge (dissenting).

I believe that the District Court correctly found as a fact and stated as a conclusion of law that the defendants' activities did not burden or affect interstate commerce within the prohibitions of the Federal Anti-Trust laws. The correctness of such finding and conclusion turns upon the often recognized distinction between direct and indirect effect of intrastate activities upon interstate commerce. The Supreme Court has pointed out that there is a necessary distinction, and that although "the precise line can be drawn only as individual cases arise, * * * the distinction is clear in principle"; and that Court has declared that this "distinction between direct and indirect effects of intrastate transactions upon interstate commerce must be recognized as a fundamental one, essential to the maintenance of our constitutional system"; and that "otherwise * * * there would be virtually no limit to the federal power, and for all practical purposes we should have a completely centralized government."[1]

In the Schechter case the defendants were engaged in the business of slaughtering chickens and selling them to retailers. They bought their fowls from commission men in the market where most of the supply was shipped in from other states. When the defendants had made their purchases the poultry was trucked to their slaughter houses in Brooklyn for local disposition through retailers. The Supreme Court said that the interstate transaction in relation to that poultry then ended; and that neither the slaughtering nor the sales by defendants to retail dealers and butchers, who in turn sold directly to consumers, were transactions in interstate commerce. The Court in its opinion further pointed out that the poultry had arrived and had become com-

[1] Schechter Poultry Corporation v. United States, 295 U.S. 495, 546, 548, 55 S. Ct. 837, 850, 851, 79 L.Ed. 1570, 97 A. L.R. 947.

mingled with the mass of property in the state, and that it was not held, used or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states. Consequently, the Court concluded that "decisions which deal with a stream of interstate commerce—where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here." 295 U.S. page 543, 55 S.Ct. page 849, 79 L.Ed. 1570, 97 A.L.R. 947.

In the instant case the "current" or "flow" of interstate commerce ended in the plant of the plaintiff, Lake Valley Farm Products Inc. where the milk which came from outside the state of Illinois was commingled with milk produced in Illinois and processed for local consumption. The milk then was "held solely for local disposition and use * * *. It was not held, used, or sold by defendants [plaintiffs] in relation to any further transactions in interstate commerce and was not destined for transportation to other states."[2] The subsequent activities of the defendants which were directed to the local sale and distribution of milk could not interfere with the "flow" or "current" of interstate commerce in milk. Our question, then, becomes one of whether defendants' activities, which were strictly intrastate, were such that their effect was substantially and directly to restrain and burden the shipment and movement of milk from Wisconsin to Illinois while the milk unquestionably was in interstate commerce.

In the opinion of the Schechter case the Supreme Court pointed out that the case before it was not of the same sort as a prosecution of conspiracy to monopolize or restrain interstate commerce in violation of the Anti-Trust Act; but for purposes of differentiating between direct and indirect effect of intrastate acts the court had recourse to cases which involved the application of the Anti-Trust Act. The following statement is of special interest in view of the facts of the instant case 295 U.S. page 547, 55 S.Ct. page 850, 79 L.Ed. 1570, 97 A.L.R. 947:

"Where a combination or conspiracy is formed, with the intent to restrain interstate commerce or to monopolize any part of it, the violation of the statute is clear. Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963. But where that intent is absent, and the objectives are limited to intrastate activities, the fact that there may be an indirect effect upon interstate commerce does not subject the parties to the federal statute, notwithstanding its broad provisions. This principle has frequently been applied in litigation growing out of labor disputes."

The Supreme Court's discussion in the Schechter case of the two cases of Local 167 v. United States[3] and Levering & Garrigues Co. v. Morrin[4] is most instructive for the problem of distinguishing between direct and indirect effect of intrastate activities of labor organizations upon interstate commerce. The case of Local 167 v. United States, supra, involved a suit to enjoin a conspiracy to restrain and monopolize interstate commerce in violation of the Anti-Trust Act. In the trial of that case it was shown that marketmen, teamsters and slaughterers had conspired to burden the free movement of live poultry into the metropolitan area in and about New York City. Marketmen had organized an association, had allocated retailers among themselves, and had agreed to increase prices. To accomplish their objects, large amounts of money were raised by levies upon poultry sold, men were hired to obstruct the business of dealers who resisted, wholesalers and retailers were spied upon and by violence and other forms of intimidation were prevented from freely purchasing live poultry. Teamsters refused to handle poultry for recalcitrant marketmen and members of the shochtim union refused to slaughter. The Supreme Court said that the evidence disclosed that the defendants had conspired to burden the free movement of poultry into the metropolitan area of New York City and concluded that the "interference by appellants and others with the unloading, the transportation, the sales by marketmen to retailers, the prices charged, and the amount of profits exacted operate substantially and directly to restrain and burden the untrammelled shipment and movement of the poultry while unquestionably it is in interstate commerce." The Court further stated that it was not neces-

---

[2] Schechter Poultry Corp. v. United States, supra, 295 U.S. page 543, 55 S. Ct. page 849, 79 L.Ed. 1570, 97 A.L.R. 947.

[3] 291 U.S. 293, 54 S.Ct. 396, 398, 78 L. Ed. 804.

[4] 289 U.S. 103, 53 S.Ct. 549, 551, 77 L.Ed. 1062.

sary to decide when interstate commerce ended and that which is intrastate began, since it was clear from the evidence that the activities of the defendants did substantially and directly restrain and burden the untrammelled shipment and movement of the poultry at a time when it unquestionably was in interstate commerce.

In Levering, etc., v. Morrin, supra, suit was brought in a Federal District Court to enjoin the commission of certain acts by the defendants, the acts complained of being alleged to interfere unlawfully with interstate commerce and to be a violation of the Federal Anti-Trust Acts. The question presented to the Supreme Court was whether the allegations of the bill disclosed the commission of acts which unlawfully interfered with interstate commerce and constituted a violation of the Federal Anti-Trust Acts. It was stated in the opinion that the prayer for relief primarily was based upon the averment that the petitioners were engaged in fabricating and erecting structural iron and steel; that they were and had been for a long time, operating such business on the open shop method in relation to their employment of labor; that they had large contracts for the construction of work in the City of New York; that respondents were organizations of labor and officers and agents thereof who had conspired, and were attempting to compel petitioners and others to employ exclusively union labor in their building operations; that in pursuance of the conspiracy respondents had called out on strike petitioners' union employees, and conducted boycotts, and undertaken other injurious interferences which particularly were set forth in the bill. The bill also contained averments to the effect that all the steel used by the petitioners in the City of New York was transported from other states and that the purpose and intent of respondents was to prevent the use of said steel in buildings to be erected by petitioners; that the effect of the success of respondents would be, among other things, to destroy the interstate traffic of petitioners in steel.

After a recital of the foregoing factual allegations of the bill the Supreme Court stated: "All this, however, is no more than to say that respondents' interference with the erection of the steel in New York will have the effect of interfering with the bringing of the steel from other states. Accepting the allegations of the bill at their full value, it results that the sole aim of the conspiracy was to halt or suppress local building operations as a means of compelling the employment of union labor, not for the purpose of affecting the sale or transit of materials in interstate commerce. Use of the materials was purely a local matter, and the suppression thereof the result of the pursuit of a purely local aim. Restraint of interstate commerce was not an object of the conspiracy. Prevention of the local use was in no sense a means adopted to effect such a restraint. It is this exclusively local aim, and not the fortuitous and incidental effect upon interstate commerce, which gives character to the conspiracy. * * * If thereby the shipment of steel in interstate commerce was curtailed, that result was incidental, indirect, and remote, and, therefore, not within the anti-trust acts, as this court, prior to the filing of the present bill, had already held. United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 410-411, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; United Leather Workers' v. Herkert & Meisel Trunk Co., 265 U.S. 457, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566. The controlling application of these cases to the present one is apparent from the review of them in the later case of the Industrial Ass'n v. United States, 268 U.S. 64, 77, 78, 80-82, 45 S.Ct. 403, 408, 69 L.Ed. 849."

The discussion and reasoning of the Supreme Court in the two foregoing cases, Local, 167 v. United States and Levering, etc., v. Morrin, furnish a helpful, if somewhat general guide for our appraisal of the intrastate activities of the defendant labor union. In the former case the defendants included approximately all of the groups and individuals who handled poultry from the moment it was delivered from interstate transportation to commission men in New York to its final sale to consumers. The facts disclose an organized effort to dominate the poultry business in the New York City area by securing control of prices and profits in the business and control of the unloading, transportation and sales of all poultry coming into that area through the channels of interstate commerce, such domination and control beginning at the very instant of the transfer from interstate to intrastate transportation. The Supreme Court summed up the factual situation and its obvious effect in the following statement: "The interference by appellants and others with the unloading, the transportation, the sales by marketmen to retailers, the prices charged, and the amount of profits exacted operates substantially and di-

rectly to restrain and burden the untrammeled shipment and movement of the poultry while unquestionably it is in interstate commerce."

In the Levering case the activities of defendants were intended to halt or suppress building operations as a means of compelling the employment of union labor and not "for the purpose of affecting the sale or transit of materials in interstate commerce"; although it was obvious that the activities of the defendants were in fact indirectly affecting interstate commerce in steel. But as stated in the opinion of the Supreme Court, the *"use* of the materials was purely a local matter, and the suppression thereof the result of the pursuit of a purely local aim." The Supreme Court further stated that it was this exclusively local aim and not the "fortuitous and incidental effect upon interstate commerce" which gave "character to the conspiracy," and that any curtailment of the shipment of steel·in interstate commerce was an incidental, indirect and remote result and not within the prohibitions of the Anti-Trust Acts.

In my opinion the facts of the instant case bring it within the reasoning and holding of the Supreme Court in Levering, etc., v. Morrin, supra.

There is no evidence of an actual intent on the part of defendants to interfere with interstate commerce. And there is no such direct and substantial effect upon interstate commerce resulting from defendants' conduct as to furnish a necessary inference of the existence of the intent.[5] The sole aim of the defendants in their interference with the local sale and distribution of milk was to secure a method of sale and distribution which would be more advantageous to them; and, in the words of the Supreme Court in the opinion in the Levering case, "it is this exclusively local aim, and not the fortuitous and incidental effect upon interstate commerce, which gives character to the conspiracy"; and if as a result of the defendants' activities the shipment of milk in interstate commerce was curtailed "that result was incidental, indirect, and remote, and, therefore, not within the anti-trust acts."

The "local aim" and the results of the activities of the defendants, both in the Levering case and in the instant case, contrast sharply with those of the defendants in the Local 167 case. There the aim, and the actual result of the organized activities of the defendants, was to directly intercept and control substantially all of the poultry coming into the New York City area in the channels of interstate commerce and to intercept the "current" of commerce in poultry at the very moment of transition from interstate to intrastate commerce.

In Blankenship v. Kurfman[6] this Court had occasion to pass upon the contention that certain intrastate activities of defendant unions and members thereof interfered with interstate commerce and amounted to a conspiracy or combination in violation of the Sherman Anti-Trust Act. It was pointed out in the opinion in that case that cases arising under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., do not involve the problem of determining the existence of a conspiracy or combination in restraint of commerce, to the existence of which it is essential that there be an intent to restrain or burden interstate commerce.

We are not concerned in this case with the question of the power of Congress under the Commerce Clause to regulate intrastate activities of labor organizations when these activities affect, or tend to affect, indirectly the current of interstate commerce. No doubt congressional findings and declaration of policy similar to those of the National Labor Relations Act, but directed to the intrastate activities of employees in their relation to commerce, would supply a basis for valid legislation aimed at the regulation of these activities. But the reasoning and holding in the Schechter case and in the Levering case, supra, surely raise doubt of the validity of the application of any such legislation to facts such as are found in the instant case. But no such legislation has been enacted and this suit is controlled by the decisions which have construed and applied the Anti-Trust Acts.

The District Court, as a further ground for refusing to grant the requested injunction, concluded that the facts of the controversy presented "a case involving or growing out of a labor dispute" within the terms of the Norris-LaGuardia Act. Assuming that the facts made "a case" within the terms of the Norris-LaGuardia Act, the court properly refused to grant the in-

---

[5] See the two Coronado cases, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A. L.R. 762, and 268 U.S. 295, 45 S.Ct.

551, 69 L.Ed. 963. 
[6] 7 Cir., 96 F.2d 450.

junctive relief since the evidence did not disclose any basis for findings which the Act requires as a condition precedent to the exercise of the court's power to issue restraining orders and injunctions.

The language of the Act forbids the granting of a restraining order or injunction, except upon conditions set out in the Act, "in a case involving or growing out of a labor dispute," 29 U.S.C.A. § 101, and in a subsequent section expressly defines the term "a case involving or growing out of a labor dispute." The congressional intent as evidenced in Section 13(a) (b) and (c) of the Act[7] is to define two types of cases "involving or growing out of a labor dispute." The first type is defined in terms of the persons who are disputing, the language being that "a case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees * * *." And it is further provided that it is immaterial whether the dispute is between employer or employees, or between employers and employers, or between employees and employees. In the foregoing type of "case involving or growing out of a labor dispute" there is no express limitation by reason of the subject matter of the dispute.

The last grammatical clause of Section 13(a) defines the second type of case in terms of the nature of the "labor dispute" as well as in terms of "persons participating in the labor dispute." To fall within this type of "case involving or growing out of a labor dispute" the case must involve conflicting or competing interest in a "labor dispute," as this term is subsequently defined in Section 13(c); and the "labor dispute" must involve "persons participating or interested," as that term is subsequently defined in Section 13(b). In this second type of "case involving or growing out of a labor dispute" the subject matter of the dispute is limited to a particular kind of controversy, but the classes of persons who may be involved include persons whose interest is neither that of an employer nor of an employee. And in New Negro Alliance v. Sanitary Grocery Co.[8] the Supreme Court held that the case was one "involving or growing out of a labor dispute" although the relation of employer and employee did not exist between the adverse parties in the case and although the defendants were not engaged in any business competitive with that of the plaintiff and even though the officers, members, or representatives of the defendant association were not engaged in the same business or occupation as the plaintiff employer or its employees. Also the Supreme Court held that the dispute was a labor dispute within the definition of Section 13(c) regardless of the fact that it did not involve terms and conditions of employment in the sense of wages, hours, unionization or betterment of working conditions.

In view of the Supreme Court's interpretation of the term "labor dispute" as defined in Section 13(c), and its interpretation of "persons participating or interested," as defined in Section 13(b), I believe that the facts of the instant case bring it within the second type of "case involving or growing out of a labor dispute."

Also I think that this case comes within the first type of case referred to above. It involves persons who are "engaged in the same industry, trade, craft or occupation" and is a dispute between the plaintiffs, consisting of employers and one association of employees, a C. I. O. local, and the defendants, another association of employees, an A. F. of L. local. As indicated above, I do not think that the term "labor dispute" as used in Section 13(a) is limited by the definition of "labor dispute" in Section 13(c). The primary intent of Section 13(a) (b) and (c) is to define two types of cases "involving or growing out of a labor dispute," and it is only as an incident to the expression of the primary intent that "labor dispute" and "persons participating or interested" are defined. The terms "labor dispute" and "persons participating or interested" are defined in (b) and (c) merely for the purpose of clarifying the definition of the second type of case which is defined as a case which "involves any conflicting or competing interests in a 'labor dispute' * * * of 'persons participating or interested' therein * * *." The possible kinds of disputes which can be involved in this latter type of "case" is less than those of the first type of case because of the limitation imposed by the restricted definition of "labor dispute" in 13(c). But the

[7] Act of March 23, 1932, c. 90, 47 Stat. 70, 73, 29 U.S.C.A. § 113.

[8] 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012.

classes of persons who may be involved are less restricted than in the first type of case because of the broad terms of the definition of "persons participating or interested."

I agree with the District Court's conclusion that the facts present "a case· involving or growing out of a labor dispute" as such "case" is defined in the Norris-LaGuardia Act.