**UNITED STATES of America et al.**

**v.**

**Robin HARPER.**

**Misc. No. 74–235.**

United States District Court,
E. D. Pennsylvania.

March 31, 1975.

Gilbert Scutti, Robert Forster, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

John D. Egnal, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Respondent Robin Harper is a Quaker who has refused to pay any income taxes

since 1958. In 1971 the IRS determined respondent's deficiency for the years 1962–1967, a determination which respondent unsuccessfully challenged in the Tax Court on the grounds, *inter alia*, that the payment of taxes to be used for war violated his religious beliefs and thus his First Amendment right to freely exercise his religion. The IRS is now attempting to collect the amounts that respondent owes for the years 1962–1967. As part of that collection effort an IRS agent served Harper with a summons requiring that he identify his assets and sources of income so that the IRS can levy on them. Harper declined to respond to the summons, and the government sought to enforce the summons in this court.

Respondent Harper opposes enforcement on the grounds that compelling him to participate in the collection of war taxes violates his First Amendment rights. Respondent also claims that enforcement would violate his Fifth Amendment rights in that the subpoenaed information could be used against him in any criminal prosecution for failure to file or pay income taxes for any year after 1967. For the reasons discussed below, we find no substance in respondent's First Amendment claim but we do find that respondent could reasonably fear that the information the IRS seeks might be used against him in a criminal proceeding, and we thus decline to enforce the summons.

*Facts*

Respondent Robin Harper was served with the summons which is the subject of this proceeding on June 13, 1974. The summons directed him to appear before Revenue Officer Mary Wright on June 25, 1975 to give testimony relating to the collection of his tax liability for the tax years 1962–1967. The summons also demanded that he bring with him "all documents and records in your possession or control which are necessary to enable a representative of the Internal Revenue Service to complete a current financial statement for [respondent]." Harper appeared before Officer Wright on June 26, 1975 (after having been granted a one-day extension), but he refused either to produce any records of his assets or income or, when asked to do so by Officer Wright, to fill out the financial statement attached to the summons.[1] The government then moved, pursuant to 26 U.S.C. § 7604 (a),[2] to have this Court enforce the summons.

The basic authority for the issuance of a summons such as the one above is 26 U.S.C. § 7602, which states:

*"Examination of books and witnesses*

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, *or collecting any such liability,* the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any

---

1. A copy of this financial statement, IRS Form 433–AB (Rev. Mar. 1972), is attached to this Memorandum as Appendix A.

2. 26 U.S.C. § 7604(a) states:
"*Jurisdiction of district court.*—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data."

other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry." (Emphasis Added)

■ The government's stated purpose for issuing this summons was to aid in the collection of respondent's taxes for the years 1962–1967. That respondent owes these taxes, as well as the precise amount he owes, has already been determined by the United States Tax Court. *Robin Harper v. Commissioner of Internal Revenue*, Tax Court Memo 1973–214; ¶ 73,214 P-H Memo TC. In the case before the Tax Court, respon-

dent challenged the Commissioner's deficiency determinations on grounds similar to those he raises here, i. e., that payment of taxes for use in war would violate his religious beliefs and, therefore, his First Amendment rights. The Tax Court, relying on *Susan Jo Russell*, 60 T.C. 942 (1973), rejected respondent's arguments.[3] Respondent's challenge to a deficiency determination for taxable year 1971 met a similar fate.[4] *Robin Harper v. Commissioner of Internal Revenue*, T.C. Memo 1974–117; ¶ 74,117 P-H Memo TC.

This is not the first time that the IRS and respondent have confronted one another over a summons. In 1958 petitioner Harper informed the IRS that he would no longer pay federal income taxes because of his opposition to United States foreign policy.[5] No action was taken against respondent by the IRS until 1966, when a Revenue Agent was assigned the task of determining respon-

3. In both *Russell* and *Harper* the Tax Court declared that an individual could not discharge his income tax obligations by paying an "equivalent tax" to organizations whose behavior more closely conformed to his religious and moral beliefs than did that of the United States Government. It was stipulated in the Tax Court that Robin Harper had made the following "equivalent tax" payments during the years in question:

| Organization | Amount of Check | Date of Check |
|---|---|---|
| Committee for Non-Violent Action | $ 50.00 | April 29, 1960 |
| Community Kindergarten | 135.00 | May 4, 1960 |
| Fellowship House | 150.00 | June 10, 1960 |
| William Penn Center | 150.00 | June 10, 1960 |
| Committee for Non-Violent Action | 400.00 | June 21, 1960 |
| Society for Social Responsibility in Science | 150.00 | Nov. 5, 1960 |
| C.A.R.E. | 500.00 | Nov. 25, 1960 |
| Central Committee for Conscientious Objectors | 100.00 | Dec. 1, 1960 |
| Vigil at Fort Detrick | 400.00 | Jan. 26, 1961 |
| Operation Freedom | 400.00 | Jan. 27, 1961 |
| Operation Freedom | 100.00 | Nov. 12, 1964 |
| Fellowship House | 100.00 | Feb. 6, 1965 |
| American Friends Service Committee | 500.00 | April 15, 1966 |
| Phila. Yearly Meeting (Society of Friends) | 250.00 | April 17, 1967 |
| Total amount of the fourteen checks: | $3,385.00 | |

4. The IRS is not presently attempting to collect respondent's deficiency for 1971.

5. This fact, as well as the other facts referred to in this section, are taken from the

stipulation entered into between the IRS and respondent before the Tax Court, which is attached as Exhibit B to Respondent's Memorandum in this case.

dent's deficiency. The agent first attempted to acquire information about respondent's income from respondent himself by serving him with a summons similar to the one herein. Respondent refused to comply with this summons, and the Revenue Agent was compelled to reconstruct respondent's income from third party sources. In 1969 respondent's deficiency was determined to be $26,159 for the tax years 1958–1967. (This figure represents $19,712 in taxes and $6,447 in penalties). When respondent was informed of the amount of this deficiency, he agreed to fill out income tax statements (Form 1040s) for each of the tax years in question. Respondent also produced his books and records to support the amounts set forth in the Form 1040s. Based on respondent's books and records and on the 1040s, only one of which was found to be inaccurate, the Revenue Agent recomputed respondent's deficiency for the years 1958–1967 at $5,726.19.[6] It was this determination which respondent unsuccessfully challenged in his first Tax Court case.

Revenue Agent Wright is presently attempting to collect the portion of this amount which represents taxes owed for years 1962–1967, an amount equal to approximately $1,400. (There is no explanation in the record of why IRS has limited its collection efforts to this period). She testified at the hearing on this matter that she tried to discover respondent's assets and sources of income from third party sources but was unable to do so.[7] She stated that the summons and subpoena which she served on respondent represented the only way she can locate monies on which a lien could be placed to satisfy respondent's tax obligations.

6. Respondent was also charged a $1,502. penalty on this figure.

7. Officer Wright testified that she was unable to discover any bank account in respondent's name through routine investigations in respondent's locale. She also testified that she had interviewed a former employer of respondent's but that he was unable to give

*Respondent's First Amendment Claim*

■ It should be stated preliminarily that the summons enforcement procedure provides respondent with an opportunity to challenge the summons on any appropriate ground. *Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). Respondent's First and Fifth Amendment objections are both appropriate grounds to raise at this stage of the proceedings.

■ Respondent claims that answering the summons would directly involve him in the collection of war revenue.[8] Respondent asserts that such coerced involvement violates his religious and moral beliefs, in contravention of the First Amendment's "free exercise of religion" clause.

This Court does not question the sincerity and intensity of respondent's opposition to war, or spending for war. Nor do we doubt that this opposition is grounded in deeply held religious beliefs rather than philosophical or political ones. Although respondent was not permitted to make a record of his past opposition to income taxes at the hearing, due to this court's uncertainty as to whether such a record was appropriate, respondent has offered the exhibits to his post-hearing brief as the evidence which he would have presented on his First Amendment claim at the hearing.

Plaintiff grounds his First Amendment claim on this Court's opinion in *American Friends Service Committee v. United States,* 368 F.Supp. 1176 (1973), *rev'd* 419 U.S. 7, 95 S.Ct. 13, 42 L.Ed. 2d 7 (1974). In *AFSC* this Court enjoined the Internal Revenue Service from enforcing the withholding tax on 51.6% of the incomes of two employees, themselves Quakers, against the Ameri-

her any information about respondent's present employment.

8. Respondent does not differentiate between tax money actually spent on war or war-related expenses, and that expended for other matters. Respondent terms United States a "warfare state" which apparently justifies in his mind the refusal to pay any money at all to it.

can Friends Service Committee, a Quaker organization. The First Amendment interests at stake were the plaintiffs' right to freely exercise their religion. An historian of the Quaker religion had testified at trial that since the beginnings of Quakerism in the seventeeth century, Quakers have taken the position that they could not engage in war or violence of any kind and could not take the life of another human being. This position became known as the "peace testimony". The historian testified that Quaker teaching required that the individual Quaker "bear witness" to his testimony through his actions as well as his words. An integral part of bearing witness to the peace testimony is refusal to participate in war in any form, including the payment of taxes that would be spent on war.

In *AFSC* it was determined that withholding plaintiffs' income taxes deprived them of the opportunity to refuse to pay war taxes. There was no doubt in either plaintiffs' or the government's mind that the government would ultimately secure these taxes by levying on plaintiffs' bank accounts; nevertheless, plaintiffs wanted to be able to receive their full income so that they could refuse to pay the tax on it. This Court held that the slight additional expense which the government would incur in collecting plaintiffs' tax by levy rather than by withholding was not compelling enough to justify the withholding method's abridgment of plaintiffs' free exercise of their regligion.

The Supreme Court reversed this Court's injunction [9] against withholding plaintiffs' taxes on the basis that an injunction was barred by 26 U.S.C. § 7421(a), which states, in pertinent part:

"No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax is assessed." [10]

Only Justice Douglas, in dissent, reached the constitutional question. He agreed with the conclusion below, that the withholding method infringed plaintiffs' right to freely exercise their religion. at 13, 95 S.Ct. 13.

Neither party in the present case seeks an injunction, and we can thus address the constitutional question untroubled by any question of § 7421(a)'s applicability. The First Amendment claim asserted here seems to be grounded in the same religiously inspired interest as was plaintiffs' claim in *AFSC*—the right to refuse to participate in war, or taxes for war. The *AFSC* plaintiffs were denied that right by having their taxes deducted without allowing them an opportunity to refuse to pay them; respondent is being denied that right by a summons requiring that he give information which will lead to the collection of his back taxes. However, the similarities between the plaintiffs end there. In *AFSC*, the only burden on the government was the minor disruption of the orderly collection of taxes and the increased cost of collection by levy. At most, the government was faced with additional difficulties in collecting plaintiffs' taxes; there was no question that

9. In *AFSC* we also awarded the American Friends Service Committee a refund of the amount which AFSC had paid the government in lieu of withholding plaintiffs' taxes. AFSC had chosen to pay the IRS an amount equivalent to what would have been withheld from plaintiffs rather than face possible criminal sanctions for violating 26 U.S.C. § 3403 (the withholding tax). AFSC was entitled to recover the money it had paid the IRS, since the IRS collected the full tax owed by plaintiffs by levying on their account. This portion of the decision was not appealed by the government.

10. The lower court opinion in *AFSC* declared, on the basis of *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S. Ct. 1125, 8 L.Ed.2d 292 (1962), that § 7321(a) did not apply since a suit for refund was unavailable to plaintiffs. The Supreme Court rejected this reasoning on the basis of *Bob Jones University v. Simon*, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 and *Commissioner v. Americans United*, 416 U.S. 752, 94 S.Ct. 2053, 40 L.Ed.2d 518, both decided subsequent to the lower court's decision in *AFSC*.

these taxes would ultimately be collected. As we stated then:

> "The plaintiffs . . . have shown that since 1970, the Internal Revenue Service has received by way of the levy process, every tax dollar to which it is entitled despite the fact that AFSC has not withheld 51.6% of the federal income tax of plaintiffs . . . ." 368 F.Supp. at 1184.

In respondent's case, however, the government will be unable to collect the tax unless respondent divulges the location of his assets and income. It is certainly not a violation of respondent's First Amendment rights for the government to collect the taxes which he owes. *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). The testimony in this case establishes that respondent's participation is necessary to the success of the collection effort. Put another way, the government's interest in forcing respondent to produce the requested information is sufficiently compelling to outweigh respondent's religious interest.

*Respondent's Fifth Amendment Claim*

Respondent also alleges that by furnishing the information the IRS seeks to compel he may incriminate himself, in violation of his Fifth Amendment rights. This question is much more difficult to resolve than respondent's First Amendment claim, both because there exist three possible standards for determining whether the Fifth Amendment applies to the situation and because this court must carefully examine and weigh all the relevant facts in making the determination under any of the three standards.

Respondent's argument that giving information about his income and assets may potentially incriminate him is based

on the admissibility of such information as evidence of willful failure to file or pay taxes. 26 U.S.C. § 7203 provides:

> "any person required to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to file a return . . . who willfully fails to pay such estimated tax or tax, or make such return . . . shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than one year, or both, together with the cost of prosecution." August 16, 1954, c. 736, 68A Stat. 851.

■ The admissibility of evidence of a defendant's income and assets or other indicia of his ability to pay a tax to show that his failure to pay that tax was willful has long been recognized by the courts. *United States v. MacLeod*, 436 F.2d 947 (8th Cir. 1971), *cert. den.* 402 U.S. 907, 91 S.Ct. 1378, 28 L.Ed.2d 647 (1971); *United States v. Rosenfield*, 469 F.2d 598 (3rd Cir. 1972). In fact, the presence or absence of such evidence may determine the government's ability to make out a prima facie case against the defendant. *United States v. Andros*, 484 F.2d 531 (9th Cir. 1973).

■ The information which the IRS seeks here could not incriminate respondent for unpaid taxes during 1962–1967 since the statute of limitations has run for those years.[11] However, it could be used in such a prosecution for unfiled or unpaid taxes in any subsequent year.[12]

Although the IRS presumably issues multitudinous § 7602 summonses annually, there are few cases dealing with Fifth Amendment claims in connection with one. Most cases have dealt with

---

11. 26 U.S.C. § 6531 provides a six year statute of limitations for the offense of willful failure to file or pay a tax. Any violation of § 7203 for the years 1962–1967 would have occurred, at the latest, on April 15, 1968, when the taxpayer's 1967 income tax return would have been due. The statute of limitations would, therefore, have expired on April 15, 1974, nearly two months before respondent was served with this summons.

12. It does not appear that respondent can properly raise Fifth Amendment objections in connection with crimes which may be committed in the future, i. e., failure to file or pay income taxes for 1974 or 1975. *United States v. Orta*, 253 F.2d 312 (5th Cir.), *cert. den.* 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed.2d 1156 (1958).

the question of whether the summons was issued for a legitimate purpose. *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); *United States v. Fisher,* 500 F.2d 683 (3rd Cir. 1974). These cases establish the rule that a summons should be enforced if it was issued in good faith (i. e., not solely in order to gain evidence for a criminal prosecution) and prior to any IRS recommendation for prosecution. Respondent has abandoned any claim that this summons was improperly issued, and this issue is no longer before us.

Some of those cases which do address the Fifth Amendment issue have developed a standard for its application which is unique to § 7602 summons enforcement. That standard is that if the IRS investigation is a civil one, the mere fact that the subpoenaed information might be used against the taxpayer in a later criminal prosecution will not support a claim of self-incrimination, but the taxpayer may raise Fifth Amendment objections if he can show that the investigation has become "an inquiry with dominant criminal overtones". *United States v. Roundtree,* 420 F.2d 845, 852 (5th Cir. 1969). This "dominant criminal overtones" language first appeared in *Stuart v. United States,* 416 F.2d 459 (5th Cir. 1969). In *Stuart,* a taxpayer turned over her per-

sonal income records to her accountant so that a Revenue Agent could more easily examine them. Upon examining these records the Revenue Agent found indications of fraud. A Special Agent [13] was appointed who promptly served taxpayer's accountant with a summons ordering production of taxpayer's records. The Special Agent informed the accountant that a criminal investigation was being undertaken against the taxpayer. On appeal from the lower court's enforcement of the summons, the Circuit Court declared that the Revenue Agent's finding of potential fraud, the appointment of a Special Agent, and the fact that this agent gave taxpayer a *Miranda* [14] warning, all added up to "an inquiry with dominant criminal overtones." 416 F.2d at 462. The Circuit Court, refusing to regard the transfer of taxpayer's records to her accountant for the convenience of the Revenue Agent as a relinquishment of possession, reversed the lower court.

In *United States v. Roundtree,* 420 F.2d 845 (5th Cir. 1969), "dominant criminal overtones" became the test for whether the Fifth Amendment could be raised to block production of documents pursuant to an IRS summons. The summons in *Roundtree* was issued as part of an investigation to determine a taxpayer's tax deficiency; presumably the investigation was being conducted by a Revenue, rather than a Special, Agent. In reversing and remanding the lower

---

13. "The I.R.S. has both an Audit Division and an Intelligence Division within each district office. The investigators assigned to the Audit Division are called revenue agents and their primary responsibility is to investigate civil aspects of enforcement of the revenue laws. The investigators for the Intelligence Division are called special agents and their primary function is to conduct civil and criminal tax fraud investigations. The special agent is usually assigned to a case upon the recommendation of the revenue agent to the Intelligence Division that his investigation has indicated that there is a possibility of fraud. Although the Audit Division and Intelligence Division have distinct functions, there is considerable overlap and interplay between agents from the two divisions in in-

vestigations where civil as well as criminal liability is suspected. The revenue agent will not in most cases complete his audit before recommending that the Intelligence Division be called in. In fact the revenue agent is required by the I.R.S. procedures to make that recommendation when he first suspects the possibility of fraud. The revenue agent is not removed from the investigation once such a recommendation has been made, but rather he continues his audit for the purpose of assisting the special agent in his investigation of civil tax fraud." Comment, *Use of the Summons, Intervention, and Constitutional Rights,* 2 Hofstra L.Rev. 135, 142 fn. 49 (1974).

14. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

court's finding of contempt against the taxpayer, the court stated:

> "If the I.R.S. sustains its contention that this is a civil investigation, the mere fact that evidence *might* be used against Roundtree in a later prosecution will not support a claim of self-incrimination. [emphasis in original]. If, however, Roundtree can show that the investigation has become "an inquiry with dominant criminal overtones" he is entitled to raise his fifth amendment objections. *Stuart v. United States*, 5th Cir. 1969, 416 F.2d 459." 420 F.2d at 852.

Roundtree added two caveats to this general rule. The first is that a finding that an investigation was civil would not predetermine the question of whether the subpoenaed evidence could be admitted in a subsequent criminal prosecution against the taxpayer, 420 F.2d at 852, fn. 16. The second was that even if the taxpayer could show that the investigation was an inquiry with dominant criminal overtones, he may not assert a blanket refusal to produce his records, but must produce his records for *in camera* inspection by the court to determine whether specific documents produced in response to specific questions would incriminate the taxpayer. 420 F.2d at 852.

The courts have uniformly been willing to find dominant criminal overtones when a Special Agent, rather than a Revenue Agent, is conducting the investigation out of which the summons has issued. *Stuart v. United States*, cited *supra; United States v. Cohen*, 388 F.2d 464 (9th Cir. 1967); *United States v. Kleckner*, 273 F.Supp. 251 (S.D.Ohio), *appeal dismissed*, 382 F.2d 1022 (6th Cir. 1967). The rationale behind this position seems to be the Special Agent's duty to investigate potential fraud, including criminal fraud, and the fact that

a special agent is not usually appointed to an investigation unless a Revenue Agent has first found some indication of fraud. See, e. g. 416 F.2d at 462.[15] However, our research has revealed only one case in which a court has permitted the Fifth Amendment to be raised in the absence of a Special Agent. *United States v. Malnik*, 348 F.Supp. 1273 (S.D. Fla.1972).

This Court is not bound by the standard enunciated in *Roundtree*, and we decline to follow it. The "dominant criminal overtones" standard lacks support from any Supreme Court cases dealing with the Fifth Amendment. In fact, in announcing the *Roundtree* standard, the Circuit Court did not refer to any Supreme Court cases but rather relied entirely on the essentially descriptive language of the earlier *Stuart* decision. But it is deceptive to speak of a standard in connection with the Supreme Court's Fifth Amendment decisions, for there are two possible standards which might apply to the present case. The first is that first set forth in *Counselman v. Hitchcock*, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), and reaffirmed in *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) and *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975): that the privilege's protection extends to any information which the "individual reasonably believes could be used against him in a criminal prosecution" . . . at 461, 95 S.Ct. at 592. The second standard is the one laid down in *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) and reaffirmed in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971): that when certain disclosures are required as part of a comprehensive regulatory scheme, the individual's Fifth Amendment privilege

15. That the Fifth Amendment applies to such situations is further supported by the Supreme Court's discussion of Fifth Amendment issues in *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) where a special agent subpoenaed taxpayer's accountant for papers which the taxpayer had delivered to him. If the Fifth Amendment had not been implicated by the subpoena, there would have been no need for the Court to discuss the nature of the taxpayer's interest in the subpoenaed papers. The same inference can be read from the Third Circuit's discussion of Fifth Amendment issues in *United States v. Fisher*, 500 F.2d 683 (1974).

must be balanced against the public need underlying the regulatory system. Which of these standards, the first or the second, applies to the present facts can only be answered by examining the purposes behind each of them.

The *Sullivan-Byers* standard, the latter of the two discussed above, appears relevant here because of the regulatory nature of the tax laws. In *Sullivan*, the Court rejected a bootlegger's claim that filing an income tax return could incriminate him by revealing his sources of income. Writing for the Court, Mr. Justice Holmes stated that such a claim amounted to "an extreme if not an extravagant application of the Fifth Amendment". 274 U.S. at 263–264, 47 S.Ct. at 607.

"As the defendant's income was taxed, the statute of course required a return . . . In the decision that this was contrary to the Constitution we are of the opinion that the protection of the Fifth Amentment was pressed too far. If the form of return provided called for answers that the defendant was privileged from making he could have raised the objection in the return, but could not on the account refuse to make any return at all." 274 U.S. at 263, 47 S.Ct. at 607.

This reasoning was not applied when a taxpayer refused to file a gambling tax return, *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), or register as a gambler. *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). Those cases were distinguished from *Sullivan* in that they were directed at a "highly selective group inherently suspected of criminal activities . . ." 390 U.S. at 47, 88 S.Ct. 697. In *Sullivan* the self-incrimination claim had been asserted in "an essentially noncriminal and regulatory area of inquiry", but the gambler's claims were lodged "against an inquiry in an area permeated with criminal stat-utes, where response to any of the . . . questions in context might involve the petitioners in the admission of a crucial element of a crime." 390 U.S. at 61, 88 S.Ct. 697.

These cases were followed by *California v. Byers*, cited *supra*, where the Court upheld a California statute which required that a driver involved in an accident stop at the scene and give his name and address. Justice Blackmun, speaking for the plurality [16], wrote:

"An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income; it requires producers and distributors of consumer goods to file informational reports on the manufacturing [402 U.S. 428, 91 S.Ct. 1538] process and the content of products, on the wages, hours, and working conditions of employees. Those who borrow money on the public market or issue securities for sale to the public must file various information reports; industries must report periodically the volume and content of pollutants discharged into our waters and atmosphere. Comparable examples are legion.

"In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here." 402 U.S. at 427–428, 91 S.Ct. at 1538.

The Court found that the California statute, "like the income tax laws", 402 U.S. at 430, 91 S.Ct. 1535, was directed at the public at large and not at any

---

16. Justice Harland concurred in the result. He did not, however, agree with the plurality's alternative holding that the information required by the California statute was not testimonial in nature. 402 U.S. 434–458, 91 S.Ct. 1541–1553.

group inherently suspected of criminal activities. The Court also noted that "most accidents occur without creating criminal liability . . ." 402 U.S. at 431, 91 S.Ct. at 1539. The Court concluded:

> "The disclosure of inherently illegal activity is inherently risky . . . But disclosures with respect to automobile accidents simply do not entail the kind of substantial risk of self-incrimination involved in Marchetti [and] Grosso . . . Furthermore, the statutory purpose is noncriminal and self-reporting is indispensable to its fulfillment." 402 U.S. at 431, 91 S.Ct. at 1539.

Whether this line of cases applies to IRS summonses depends in large part on the scope to be given the Court's dicta in *United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975), where a "John Doe" summons requiring a bank to produce records dealing with all deposits over a certain amount was upheld even though the IRS did not know the identity of the taxpayer suspected of irregularities. *Bisceglia* described the § 7602 summons as "essential to our self-reporting system."

> "We recognize that the authority vested in tax collection may be abused, as all power is subject to abuse. However, the solution is not to restrict that authority so as to undermine the efficacy of the federal tax system, which seeks to assure that taxpayers pay what Congress has mandated and prevents dishonest persons from taxation and thus shifting heavier burdens to honest taxpayers." at 146, 95 S.Ct. at 919.

The Court then referred to the judicial power under *Powell* and *Donaldson*, cited supra, pp. 990–991, to oversee the summon's enforcement as a check on IRS abuse of the summons power.

While *Bisceglia's* categorization of the summons power as essential to the success of the self-reporting tax system arguably puts the summons on the same level as a federal tax return in *Sullivan* or the disclosure statute involved in *Byers*, we believe that the interests at stake in a summons proceeding are distinguishable from these latter situations. While summonses may not be principally directed at persons "inherently suspect of criminal activities", *Marchetti*, cited *supra*, at 57, 88 S.Ct. 697, they are definitely not directed at the public at large. More information is required by the summons here than is required by the ordinary tax return form, and the setting of compulsion connotes a greater risk of self-incrimination than does the filing of an ordinary tax return or disclosing one's name, address, and the fact that one has been involved in an auto accident.

Having determined that the *Sullivan-Byers* standard does not apply to this case, the *Hitchcock-Hoffman-Maness* standard must apply.[17] In order to uphold the privilege as defined in these cases, it must appear to the Court's satisfaction that respondent could reasonably expect that the subpoenaed information might lead to a criminal prosecution against him or be used against him in a criminal prosecution. *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574. The Third Circuit has said that, in applying this standard:

> "It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in the circumstances of the particular case" *United States v. Coffey*, 108 F.2d 438, 440 (3rd Cir. 1952) (Hastie, J.)

In order to sustain his claim, the respondent must show a reasonable basis

---

17. There is no question that the privilege as defined by these cases can be raised in a civil proceeding. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The *Hitchcock-Hoffman-Maness* standard was applied in an IRS summons enforcement proceeding in *United States v. Malnik*, 348 F.Supp. 1273 (S.D.Fla.1972).

both for an expectation of prosecution under IRC § 7203 and that the subpoenaed information would be used against him in such a prosecution. As for the first factor, there are several facts which might indicate that such a prosecution would not be brought. Foremost among them is the fact that no Special Agent has been assigned to respondent's case. Revenue Officer Wright testified that IRS procedures require her to discontinue her investigation and refer any matter involving possible criminal violations to a Special Agent. She further testified that she has not referred this case to a Special Agent nor was it being handled any differently than any other case assigned to her. Nevertheless, we do not accept the absence of a Special Agent as conclusive evidence that respondent's Fifth Amendment Claim is groundless. While it is true that IRS procedures require a Revenue Agent to recommend that a Special Agent be appointed when he first suspects the possibility of fraud,[18] the respondent herein does not apprehend a prosecution for fraud but a prosecution for willful failure to file or pay a tax. Therefore, the fact that Revenue Agent Wright has not recommended that a Special Agent be called in does not mean that the tax enforcement proceedings have not advanced far enough to raise a legitimate apprehension in the taxpayer. As pointed out in the section discussing the requirements of proving a willful failure to file or pay a tax, *supra,* p. 990, the information sought here may endanger respondent regardless of whether it is collected by a Revenue Agent or a Special Agent.

A second fact mitigating against prosecution is the small amount of money involved. A third fact, apparently mitigating against the prosecution, is in reality a double-edge sword. That fact is the government's failure to prosecute respondent even though respondent has avowedly refused to pay any income taxes since 1958. While this fact may indicate the government's unwillingness or distaste for prosecution in this matter, it also establishes a compelling reason for prosecution, i. e., a history of defiance.

In support of respondent's apprehension it can be argued that the history of IRS forbearance in this case does not date from 1958, but from either 1966, when the IRS began its investigation of respondent, or even from 1973, when the Tax Court finally rejected respondent's anti-war defense and adjudicated the amount of his liability. Along these lines, it should be noted that the issue of whether anti-war principles was a proper defense to a willful failure to pay charge was not conclusively decided in the IRS's favor in this Circuit until 1973. *United States v. Malinowski,* 472 F.2d 850. The date of the *Malinowski* decision and Tax Court decision adverse to respondent are important if the IRS was concerned about making respondent's situation into a test case on the issue of willfulness in a § 7203 prosecution. If the IRS was so concerned, its forbearance from prosecuting respondent can date only from 1973.

As stated above, we must also determine whether respondent could reasonably apprehend that the subpoenaed information could be used against him in a § 7203 prosecution. The government insists that by filing tax retkrns for the years 1958–1967, and 1971, and by offering evidence of amounts paid as "alternative tax" in the Tax Court, respondent has already supplied more direct evidence of his ability to pay than could be expected from his compliance with this summons.[19] While there may be some truth to the government's contention, the summons herein requires a much more detailed revelation of his assets

18. Lipton, *Constitutional Protection for Books and Records in Tax Fraud Investigations,* 29 N.Y.U.Inst. of Tax 945, 952 (1971).

19. This assertion by the government may be interpreted as an argument that respondent waived his Fifth Amendment rights by furnishing the limited amount of income information contained in the Form 1040s and respondent's petitions to the Tax Court. If this is the government's contention we cannot agree that respondent's conduct so far amounts to waiver.

and income than was given in the Tax Court or on his 1040 returns. It is also arguable that the government will not need to use the subpoenaed evidence in a § 7203 prosecution, since respondent's defiant conduct for the past 17 years, when added to the evidence of income which he has already supplied, will be more than enough to establish willfulness. However, this court cannot lightly suppose that the prosecution will dispense with evidence which is available to it, especially when it may show a more contemporaneous ability to pay than the other evidence which is alleged to be sufficient.

Since we have determined that the information which the IRS seeks could be sufficiently damaging to respondent that it might be used against him in a § 7203 prosecution, it is also reasonable to expect that the acquisition of htis information might prompt the IRS to bring such a prosecution. This would be another form of self-incrimination over and beyond the forms heretofore duscussed.

It would seem logical for this court to enforce this summons upon the condition that the information obtained could not be used against respondent in a prosecution for willful failure to file or pay taxes (or any other criminal prosecution). But this procedure would violate both the command of the Supreme Court and the purposes of the privilege itself. In *Maness v. Meyers,* cited supra, the court rejected the argument that the privilege was unavailable to a witness because he could always move to suppress in any subsequent criminal action.[20] The court said:

"Laying to one side possible waiver problems that might arise if the witness followed that course. cf. *Rogers v. United States,* 340 U.S. 367, 71 S. Ct. 438, 95 L.Ed. 344 (1951), we nevertheless cannot conclude that it would

afford adequate protection. Without something more 'he would be compelled to surrender the very protection in which the privilege is designed to guarantee'. Hoffman v. United States, supra, 341 U.S. at 486, 71 S.Ct. at 818." at 462, 95 S.Ct. at 593.

The court distinguished the case of *United States v. Blue,* 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966), on the grounds that in *Blue* the government had already obtained possession of the allegedly incriminating evidence referring to the case before it. The court stated:

"... here on the contrary, petitioner's client had not yet delivered the subpoenaed material, and he consistently and vigorously asserted his privilege. Here the 'cat' was not yet 'out of the bag' and reliance upon a later objection or motion to suppress would 'let the cat out' with no assurance whatever of putting it back." at 463, 95 S.Ct. at 593.

Indeed, such a holding seems compelled by the Court's own definition of the privilege as protecting an individual not from the introduction of incriminating evidence but from compelling him to produce it.

We conclude from an examination of all the facts in this case that although the IRS probably does not have the present intention of prosecuting respondent, respondent's apprehension of such a prosecution and the use of the subpoenaed evidence against him in such a prosecution is not unreasonable. To force respondent to answer the summons when there exists a reasonable expectation that it could be used against him would allow the compulsion the privilege prohibits.

■ We are convinced from an examination of the form which Agent

---

20. In so declaring the Court pointed to the lack of any "state statute or rule guaranteeing a privilege or assuring that at a later criminal prosecution the [evidence] would be inadmissible." at 470, 95 S.Ct. at 597. We interpret this to mean a statute unconditionally barring the evidence or granting a witness immunity from its use. Of course, all Fifth Amendment problems in this case could be avoided by granting respondent immunity from the use of the subpoenaed information in any criminal prosecution.

Wright requested respondent to fill out that respondent need not make a more specific refusal than he has already made. We will not require respondent to specifically refuse to answer each question on the form, since the form, taken as a whole, calls for information which might reasonably be expected to incriminate him.

The conclusion does not represent a threat to the orderly and efficient collection of taxes. All the government need do is grant respondent immunity from the use against him in a criminal prosecution of any evidence obtained through the summons, or as a result of the evidence obtained from the summons.

*APPENDIX A*

| FORM 433-AB (Rev. Mar. 1972) | DEPARTMENT OF THE TREASURY—INTERNAL REVENUE SERVICE **STATEMENT OF FINANCIAL CONDITION AND OTHER INFORMATION** |
|---|---|

TAXPAYER'S NAME AND ADDRESS

CHECK APPROPRIATE BLOCK:
INDIVIDUAL ☐
PARTNERSHIP ☐
CORPORATION ☐

IF BUSINESS, SHOW ADDRESS AND EMPLOYER IDENTIFICATION NUMBER   BUSINESS PHONE

**IF INDIVIDUAL, COMPLETE THIS SECTION**

| HOME PHONE | BUSINESS PHONE Husband (H) Wife (W) | OCCUPATION (H) (W) | AVG. MONTHLY TAKE HOME PAY (H) (W) | SOCIAL SECURITY NUMBER (H) (W) |
|---|---|---|---|---|

| HUSBAND'S EMPLOYER (Name and address) | HUSBAND'S FIRST NAME (If not shown above) | DATES PAID | HOW LONG EMPLOYED |
|---|---|---|---|

| WIFE'S EMPLOYER (Name and address). | WIFE'S FIRST NAME (If not shown above) | DATES PAID | HOW LONG EMPLOYED |
|---|---|---|---|

| MARITAL STATUS SINGLE ☐ MARRIED ☐ | NUMBER OF EXEMPTIONS (Excluding H and W) | DATE OF BIRTH (H) (W) | NAME AND ADDRESS OF NEXT OF KIN (Other than spouse) |
|---|---|---|---|

| OTHER INCOME (Sources) | AMOUNTS | DATES RECEIVED |
|---|---|---|

**IF PARTNERSHIP OR CORPORATION, COMPLETE THIS SECTION**

| ESTIMATED AVERAGE NET INCOME FOR NEXT SIX MONTHS | NET INCOME FOR PAST TWO YEARS 19___ $___   19___ $___ |
|---|---|

GIVE THE FOLLOWING INFORMATION ON OFFICERS OR PARTNERS

| NAME AND TITLE | ADDRESS | NUMBER OF SHARES OR INTEREST |
|---|---|---|
| | | |
| | | |
| | | |

**GENERAL INFORMATION, COMPLETE THIS SECTION IN ALL CASES**

| BANK ACCOUNTS WITH (Names and addresses) | LOCATION AND NUMBER OF EACH SAFE DEPOSIT BOX |
|---|---|
| DESCRIPTION AND LICENSE NUMBER OF EACH VEHICLE | REAL PROPERTY (Brief descriptions and locations) |

**LIFE INSURANCE POLICIES NOW IN EFFECT**

| POLICY NUMBER | NAME OF COMPANY | RIGHT TO CHANGE BENEFICIARY | | AMOUNT OF POLICY | CASH SURRENDER VALUE | BALANCE DUE ON LOAN |
|---|---|---|---|---|---|---|
| | | YES | NO | | | |
| | | | | | | |

ARE FORECLOSURE, BANKRUPTCY, RECEIVERSHIP, OR ASSIGNMENT FOR BENEFIT OF CREDITORS PROCEEDINGS PENDING?
YES ☐   NO ☐

HAVE YOU DISPOSED OF ANY ASSETS OR PROPERTY BY SALE, TRANSFER, EXCHANGE, GIFT OR IN ANY OTHER MANNER EXCEPT FOR FULL VALUE FROM THE BEGINNING OF THE TAXABLE PERIOD IN WHICH THE LIABILITY WAS INCURRED TO THE PRESENT DATE?
YES ☐   NO ☐ (If yes, attach separate statement to show amounts, dates, circumstances, etc.)

ADDITIONAL INFORMATION—INCLUDE A STATEMENT REGARDING PROSPECT OF INCREASE IN VALUE OF ASSETS OR IN PRESENT INCOME.

998

## STATEMENT OF ASSETS AND LIABILITIES

| ITEM | PRESENT VALUE | LIABILI-TIES BAL. DUE | EQUITY IN ASSET | AMOUNT OF MO. PAYMENT | PLEDGEE OR OBLIGEE | DATE PLEDGED | DATE OF FINAL PAYMENT |
|---|---|---|---|---|---|---|---|
| CASH | | | | | | | |
| BANK ACCOUNTS | | | | | | | |
| STOCKS AND BONDS | | | | | | | |
| CASH OR LOAN VALUE OF INS. | | | | | | | |
| ACCOUNTS/NOTES RECEIVABLE | | | | | | | |
| MERCHANDISE INVENTORY | | | | | | | |
| MACHINERY AND EQUIPMENT | | | | | | | |
| HOUSEHOLD FURNITURE | | | | | | | |
| REAL PROPERTY | | | | | | | |
| VEHICLES | | | | | | | |
| OTHER ASSETS (Describe) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| FEDERAL TAXES OUTSTANDING | | | | | | | |
| ACCOUNTS/NOTES PAYABLE | | | | | | | |
| OTHER (Include judgments) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| TOTAL | | | $ | $ | | | |

## MONTHLY INCOME AND EXPENSE ANALYSIS

| INCOME | | | |
|---|---|---|---|
| TAKE HOME PAY (Husband) | $ | RENT | $ |
| TAKE HOME PAY (Wife) | | GROCERIES | |
| CONTRIBUTIONS FROM OTHERS | | INSTALLMENT PAYMENTS (From above) | |
| NET INCOME FROM BUSINESS | | UTILITIES | |
| OTHER (Specify) | | AUTO EXPENSES | |
| | | OTHER (Specify) | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| TOTAL | $ | TOTAL | $ |
| | | NET DIFFERENCE (Income less personal expenses) | |

**AFFIDAVIT** *Under penalties of perjury, I declare that this statement of assets and liabilities and other information is true and correct to the best of my knowledge and belief.*

| SIGNATURE | SIGNATURE | DATE |
|---|---|---|
| | | |

PO 1972 OL—462-520

(Back)

**FORM 433-AB** (Rev 3-72)